Filed 8/15/24; Modified and Certified for Pub. 9/13/24 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| UPLAND COMMUNITY FIRST, | |
| Plaintiff and Appellant, | E078241 |
| v. | (Super.Ct.No. CIVDS2013558) |
| CITY OF UPLAND, | OPINION |
| Defendant and Respondent; | |
| BRIDGE DEVELOPMENT PARTNERS, LLC, | |
| Real Party in Interest and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  David S. Cohn, Judge.  Reversed with directions.

Briggs Law Corporation, Cory J. Briggs and Janna M. Ferraro for Plaintiff and Appellant.

Monchamp Meldrum, Amanda Monchamp and Joanna Meldrum for Real Party in Interest and Appellant.

Richards, Watson & Gershon and Ginetta L. Giovinco for Defendant and Respondent.

## I. INTRODUCTION

In April 2020, defendant and respondent the City of Upland (City) approved the development of a 201,096 square-foot "warehouse/parcel delivery service building," to be located on 50.25 acres near the Cable Airport (the project). As the lead agency for the project under the California Environmental Quality Act (CEQA; Pub. Res. Code, § 21000 et seq.[1]), the City passed a resolution adopting a mitigated negative declaration (MND) for the project (§ 21064.5; 14 Cal. Code Regs. ("CEQA Guidelines") § 15369.5). In related resolutions, the City approved an airport land use compatibility request, a site plan and design review, lot line adjustment, and development agreement for the project. There is no confirmed tenant for the project.

Plaintiff and appellant Upland Community First (UCF) filed a petition for a writ of mandate and complaint for declaratory and injunctive relief, asking the superior court to order the City to set aside the MND and other project approvals. Among other things, UCF claimed the project violated CEQA (§ 21000 et. seq.) because a fair argument could be made that the project would have significant impacts on greenhouse gas (GHG) emissions, traffic, and air quality. Thus, UCF claimed the City should have prepared an environmental impact report (EIR) to assess the project's potential impacts on GHG emissions, traffic, and air quality.

---

[1] Undesignated statutory references are to the Public Resources Code.

The court granted UCF's petition solely on the ground that insufficient evidence supported the City's use of two quantitative " 'thresholds of significance' " for measuring the project's cumulative impacts on GHG emissions: (1) a threshold of 10,000 metric tons of carbon dioxide equivalent per year (MTCO2 e/yr.) (the 10,000 threshold), and (2) a lower threshold of 3,000 MTCO2 e/yr. (the 3,000 threshold). The City analyzed the 3,000 threshold in a "Supplement GHG Analysis," in response to comments on the draft MND that the 10,000 threshold was too high for the project. The comments indicated that the 10,000 threshold was appropriate for large, industrial projects with primary stationary-source GHG emissions (e.g., power plants, factories), and the 3,000 threshold was appropriate for mixed-used commercial/industrial projects, with primary mobile-source GHG emissions, like the project. In response, the project developer, real party in interest Bridge Development Partners, LLC (Bridge), revised the project to add sustainability features (e.g., roof-top solar, EV-charging stations) to ensure that the project's GHG emissions would be below the 3,000 threshold.

In its order granting the petition, the court stated that an EIR was not "necessarily" required for the project because the City had "discretion to choose an appropriate 'threshold of significance' [for GHG emissions] and to determine under that standard whether an EIR is required." The judgment orders the issuance of a preemptory writ, directing the City to set aside its resolutions approving the MND and the other project approvals, solely "for the purpose of addressing the sufficiency of evidence supporting the City's threshold of significance for GHG emissions under CEQA . . . ." Both UCF

3

and Bridge appeal from the judgment. The City does not appeal but joins the cross-respondent's brief portion of Bridge's combined reply brief and cross respondent's brief.

In its appeal, Bridge claims substantial evidence supports the City's use of both the 10,000 MTCO2 e/yr. and 3,000 MTCO2 e/yr. quantitative thresholds of significance for GHG emissions. Alternatively, Bridge claims that even if substantial evidence does not support the City's use of either quantitative threshold, substantial evidence supports the City's determination that the project's GHG impacts would be less than significant based on a qualitative, performance-based standard—that is, because the project's features are consistent with the City's 2015 climate action plan (the Upland Climate Action Plan or UCAP). Bridge further claims any CEQA-related error in the City's GHG-related findings was not prejudicial because the City fully disclosed and evaluated the project's GHG emissions, imposed adequate mitigation measures, and the City and the public were fully informed of the significance of the project's GHG impacts.

We agree with Bridge that substantial evidence supports the City's finding that the project would not have significant impacts on GHG emissions. Specifically, substantial evidence both supports the City's use of the 3,000 threshold for measuring the significance of the project's GHG emissions and shows that the project's GHG emissions would be below the 3,000 threshold. Thus, we do not consider Bridge's two alternative claims, that the project's (1) compliance with the 10,000 threshold and (2) consistency with the UCAP also support the City's determination that the project would have less

4

than significant impacts on GHG emissions.[2]  We further conclude that Bridge forfeited its UCAP consistency claim by failing to raise the claim in the superior court as a defense to UCF's claim that insufficient evidence supports the City's determination that the project would have less than significant impacts on GHG emissions.

In its appeal, UCF claims the City undercounted the number of vehicles and vehicle trips the project would generate for purposes of evaluating the project's impacts on traffic, and by extension, on air quality and GHG emissions.  More specifically, UCF claims the City failed to "perform a legally sufficient evaluation" of the project's traffic and transportation impacts by failing to conduct a vehicle miles traveled (VMT) analysis.  UCF claims that, because the City's conclusion that the project would not have significant impacts on GHG emissions and air quality is based in part on the City's undercounting of vehicles and vehicle trips and the City's failure to conduct a VMT analysis, substantial evidence supports a fair argument that the project will have significant impacts on traffic, transportation, air quality, and GHG emissions.

---

[2]  Bridge has requested that we take judicial notice of an amici curiae brief, filed by the California Attorney General and the California Air Resources Board, in *Albert Thomas Paulek, et al.* v. *Moreno Valley Community Services District* (Nov. 20, 2020), E071184) [non pub. opn.]).  (Evid. Code, §§ 452, subd. (d), 459.)  Bridge claims the brief supports Bridge's claim that substantial evidence supports the City's reliance on the 10,000 threshold.  UCF opposes the request, and we deny it.  Even if the brief supports the City's reliance on the 10,000 threshold, the brief is irrelevant to the dispositive question of whether sufficient evidence supports the City's reliance on the 3,000 threshold.  (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1089, fn. 4 [denying request for judicial notice of irrelevant matter].)

We find no merit to UCF's appeal.  Thus, we reverse the judgment and remand the matter with directions to enter judgment in favor of the City and Bridge on UCF's petition and complaint.

## II.  FACTS AND PROCEDURE

### A.  *The Project Site Is Currently Used for a Rock and Gravel Crushing Operation*

The 50.25-acre project site is located adjacent to the Cable Airport, northeast of Central Avenue and Foothill Boulevard in the City.  The site is currently used for a rock and gravel crushing operation, involving the use of heavy equipment and trucks.  On a daily basis, an average of 78 trucks travel to and from the site.  The site is surrounded by a mix of commercial and industrial uses, and the City's has designated and zoned the site for "commercial/industrial mixed use (C/I-MU)."

### B.  *The Proposed Project Is a 201,096 Square-Foot Warehouse Building*

On April 25, 2019, Bridge submitted its original application to develop the project site.  Bridge originally sought to build three warehouse buildings totaling 977,246 square feet.  In response to concerns that the project was too large, on October 1, 2019, Bridge submitted revised plans, proposing to build a single warehouse building totaling 276,825 square feet.  Following additional review, on November 23, 2019, Bridge submitted the plans for the project in its approved form:  a single, one-level, 201,096 square-foot building.

The proposed 201,096-square foot building would include 191,096 square feet for "warehouse/parcel delivery uses" and 10,000 square feet for an employee office area and "a small area for visitors to pick up pre-ordered packages."  The MND states that, "[t]o

6

be conservative, the initial study and technical studies prepared for this Project analyzed a 276,250 [square-foot] building, which is 75,154 square feet more than the 201,096-[square foot] building [currently] proposed . . . ." The building would include "16 dock-hi doors for trucks, and 8 van loading doors," and there would be 337 parking spaces, 12 trailer stalls, and 1,104 van parking stalls. "Trees and other vegetation" would screen the van loading areas. In total, the project would have 464,380 square feet of landscaping, covering 21 percent of the project site.

C. *In 2015, The City Updated Its General Plan by Adding a Commercial/Industrial Mixed-Use Designation (CI-MU) and a Climate Action Plan (the UCAP)*

In 2015, the City updated its general plan (the GPU or General Plan Update) and the Upland Zoning Code to add a land use designation for a "commercial/industrial mixed use" or "CI-MU" zoning district. The EIR for the GPU (the GPU EIR) anticipated and analyzed growth of 6,374,695 square feet of total non-residential uses in the City by 2035, including 3,710,465 square feet of nonresidential development in the C/I-MU designation. The project site is designated and zoned C/I-MU in the 2015 GPU and Upland Zoning Code.

The GPU added a "climate action plan" to the City's general plan (the UCAP or Upland Climate Action Plan). The environmental impacts of the UCAP were reviewed in the 2015 GPU EIR. The UCAP is intended to implement the City's policy of reducing GHG emissions, as outlined in the GPU and consistent with California's statewide GHG reduction goals. The UCAP states that projects that are consistent with the GPU's 2035

7

growth projections are "consistent with the [UCAP] and will not have a potentially significant effect on the environment with respect to greenhouse gas emissions."

The UCAP states that the City's approach to reducing GHG emissions, through the GPU and the UCAP, is consistent with CEQA Guidelines section 15183.5, subdivision (a), which allows lead agencies to adopt plans for reducing GHG emissions, "that can then be used for project-specific environmental documents to tier from . . . ." The UCAP contemplates that it would be "updated on an on-going, as needed basis to ensure the City's climate protection efforts reflect both current legislation and emerging best practices."

D. *The City's Environmental Review of the Project*

As CEQA requires, the City performed an initial study of the project to determine whether it may have significant environmental effects. (CEQA Guidelines, § 15063.) On December 16, 2019, the City circulated the draft initial study and proposed MND (the draft MND) to the public for review and comment. (CEQA Guidelines, § 15105, subd. (b).) As indicated, the draft MND analyzed the project as a larger, 276,350-square-foot warehouse, not as the 201,096-square-foot warehouse Bridge was proposing. The draft MND concluded that, with mitigation, all environmental impacts of the project would be less than significant. The draft MND analyzed potential impacts from the project's GHG emissions using (1) a quantitative comparison to the 10,000 threshold, which, according to the draft MND, was recommended by the South Coast Air Quality Management District (the SCAQMD), and (2) a qualitative evaluation of the consistency of the project's GHG emissions with the 2015 GPU and UCAP.

Comments on the draft MND indicated the 10,000 threshold was too high for a mixed-use commercial/industrial warehouse project, and urged the City to use a 3,000 threshold that the SCACMD had proposed lead agencies use for all land use projects, and for "mixed-use" commercial/industrial projects in particular. In response, and following further working group sessions with the City Planning Commission, Bridge further refined the project by adding sustainability features "to reduce the project's GHG emissions even further so that they would be less than 3,000 metric tons of [carbon dioxide equivalent] per year." The added sustainability features include solar panels to allow the building to operate with "net-zero" electricity consumption; EV [electric vehicle]-ready parking spaces and charging stations; and additional landscaping.

The City also completed a "supplemental GHG analysis of the project's emissions, showing that, with revised (increased) baseline emissions, and the added sustainability features, the project would generate 2,904 [MTCO2 e/yr.,] less than the 3,000 threshold." Like the original GHG analysis in the draft MND, the Supplemental GHG analysis assumed the project would be a 276,250-square- foot warehouse building. Two peer review entities evaluated and confirmed the City's Supplemental GHG analysis.

E. *The MND and Project Approvals*

In February 2020, the City Planning Commission and Cable Airport Land Use Committee (ALUC) recommended that the City Council adopt and approve the proposed MND, together with other project approvals: a proposed site plan and design review, lot line adjustment, and development agreement. In April 2020, the City adopted resolutions adopting the MND and the related proposals.

9

F. *The Superior Court Proceedings*

In July 2020, UCF filed a petition for a writ of mandate under CEQA together with a complaint for declaratory and injunctive relief, asking the superior court to order the City to set aside its resolutions adopting the MND and other project approvals, on the grounds the approvals violated CEQA and other applicable laws. In a 65-page order, the court granted the petition solely on the that ground that insufficient evidence supported the City's finding that the project would not have significant impacts on GHG emissions. The court ruled that the record contained insufficient evidence to show that either the 10,000 threshold or the 3,000 threshold were appropriate thresholds of significance for measuring the project's GHG emissions.

The court's order states: "[T]he court grants UCF's petition on the sole ground that substantial evidence does not support the 'threshold of significance' chosen for GHG emissions. As a result, the City's finding that there will be no significant effect on the environment with respect to GHG emissions is without adequate support. This does not mean, necessarily, that an EIR is required. The City has discretion to choose an appropriate 'threshold of significance' and to determine under that standard whether an EIR is required. [CEQA Guidelines, § 15064.4, subd. (c)).] The Development Agreement is also set aside, because its approval was based, in part, on the findings of the MND that there will be no significant effect on the environment with respect to GHG emissions." On October 19, 2021, the court entered judgment in favor of UCF. Both Bridge and UCF appealed.

III.  STANDARD OF REVIEW

A.  *Mitigated Negative Declarations Under CEQA*

" '[A] public agency pursuing or approving a project need not prepare an EIR unless the project may result in a "significant effect on the environment" (§§ 21000, subd. (a), 21151, subd. (a)), defined as a "substantial, or potentially substantial, adverse change in the environment" (§ 21068).  If the agency's initial study of a project produces substantial evidence supporting a fair argument the project may have significant adverse effects, the agency must (assuming the project is not exempt from CEQA) prepare an EIR.' " (*Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 171 (*Save the Plastic Bag Coalition*); *Save Agoura Cornell Knoll v. City of Agoura Hills* (2020) 46 Cal.App.5th 665, 674-675 (*Save Agoura Cornell Knoll*).)

Substantial evidence is " 'enough relevant information and reasonable inferences . . . that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393; § 21080(e)(1), (e)(2); CEQA Guidelines, § 15384, subd. (a).)  Substantial evidence includes "facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts," but does not include "[a]rgument, speculation, unsubstantiated opinion or narrative."  (CEQA Guidelines, § 15384, subds. (a), (b).)

If, following the initial study, " '[t]here is no substantial evidence, in light of the whole record . . . that the project may have a significant effect on the environment,' " the agency may prepare a negative declaration for the project.  (*Save the Plastic Bag*

*Coalition*, *supra*, 52 Cal.4th at p. 171; § 21080, subd. (c)(1); see CEQA Guidelines, § 15064, subd. (f)(3).) If, however, substantial evidence shows the project may have a significant environmental impact, but the impact can be mitigated to insignificance through project revisions that the applicant agrees to before the agency approves the project, the agency may prepare a *mitigated* negative declaration (MND) for the project. (§ 21064.5; see CEQA Guidelines, § 15064, subd. (f)(2).)

"Mitigated negative declarations reflect the policy that a lead agency's determination of environmental impacts should be based on the form of the project as considered for approval, not as [the project] might otherwise have been constructed or conducted." (1Kostka & Zischke, Practice Under the California Environmental Quality Act (Cont. Ed. Bar 2023) § 6.60, pp. 6-64.) When an agency circulates a draft initial study and a proposed MND to the public for comment, the public has " ' "an opportunity to review the proposal to determine whether the changes are sufficient to eliminate the significance of the effects." ' " (*Rominger v. County of Colusa* (2014) 229 Cal.App.4th 690, 713, overruled in part by *Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1194.)

B. *Standard of Review for MNDs*

On appeal from a judgment in a mandamus proceeding under CEQA, our standard of review is the same as the trial court's: we independently review the administrative record and the lead agency's action, not the trial court's decision and in this sense our review under CEQA is de novo. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427; *Golden Door Properties*, *LLC v.*

12

*County of San Diego* (2020) 50 Cal.App.5th 467, 504.) We review an agency's decision to rely on an MND for a " ' "prejudicial abuse of discretion," which "is established if the agency has not proceeded in a manner required by law or if the [agency']s determination or decision is not supported by substantial evidence." ' " (*Jensen v. City of Santa Rosa* (2018) 23 Cal.App.5th 877, 886 (*Jensen*); *Save the Plastic Bag Coalition*, *supra*, 52 Cal.4th at p. 171; § 21168.5.)

"In reviewing an agency's decision to adopt an MND, a court (whether at the trial or the appellate level) must determine whether there is substantial evidence in the record to support a 'fair argument' that a proposed project may have a significant effect on the environment. [Citation.] The fair argument standard creates a 'low threshold' for requiring an EIR, reflecting a legislative preference for resolving doubts in favor of environmental review. [¶] Whether the evidence establishes a fair argument that a project may result in significant environmental impacts is a question of law." (*Preserve Poway v. City of Poway* (2016) 245 Cal.App.4th 560, 575-576 (*Preserve Poway*); *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 84.) The petitioner has the burden of proving "the existence of substantial evidence supporting a fair argument of significant environmental impact." (*Jensen*, *supra*, 23 Cal.App.5th at p. 886.)

Under the fair argument standard, a court may not uphold an agency's decision to adopt an MND, " ' "merely because substantial evidence was presented that the project would not have [a significant environmental] impact. The [reviewing] court's function is to determine whether substantial evidence support[s] the agency's conclusion as to whether the prescribed 'fair argument' could be made. If there [is] substantial evidence

13

that the proposed project might have a significant environmental impact, evidence to the contrary is not sufficient to support a decision to dispense with preparation of an EIR and adopt a negative declaration, because it [can] be 'fairly argued' that the project might have a significant environmental impact. Stated another way, if the court perceives substantial evidence that the project might have such an impact, but the agency failed to secure preparation of the required EIR, the agency's action is to be set aside because the agency abused its discretion by failing to proceed 'in a manner required by law.' " ' " (*Save Agoura Cornell Knoll v. City of Agoura Hills* (2020) 46 Cal.App.5th 665, 675-676, quoting *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1112.) In sum, under the fair argument standard, "deference to the agency's determination is not appropriate and [the agency's] decision not to require an EIR can be upheld only when there is no credible evidence to the contrary." (*Lucas v. City of Pomona* (2023) 92 Cal.App.5th 508, 536-537.)

### IV. ANALYSIS / BRIDGE'S APPEAL

A. *CEQA Provisions*

A project's impacts on global GHG emissions and climate change are necessarily cumulative impacts. (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th. 204, 219 (*Center for Biological Diversity*).) "The challenge for CEQA purposes is to determine whether the impact of the project's emissions of greenhouse gases is *cumulatively* considerable, in the sense that 'the incremental effects of [the] individual project are considerable when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future

projects.' (§ 21083, subd. (b)(2); see CEQA Guidelines, § 15064, subd. (h)(1).)" (*Id*. at p. 219.)

"In 2010, the Natural Resources Agency promulgated a guideline for assessing the significance of greenhouse gas emissions impacts under CEQA. Guidelines section 15064.4, subdivision (a) provides in part that '[a] lead agency should make a good-faith effort, based to the extent possible on scientific and factual data, to describe, calculate or estimate the amount of greenhouse gas emissions resulting from a project.' Subdivision (b) states that '[a] lead agency *should consider* the following factors, among others, when assessing the significance of impacts from greenhouse gas emissions on the environment: [¶] (1) The extent to which the project may increase or reduce greenhouse gas emissions as compared to the existing environmental setting; [¶] (2) Whether the project emissions exceed a threshold of significance that the lead agency determines applies to the project; [¶] (3) The extent to which the project complies with regulations or requirements adopted to implement a statewide, regional, or local plan for the reduction or mitigation of greenhouse gas emissions.' " (*Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 3 Cal.5th 497, 512, italics added.)

CEQA Guidelines section 15064.4 "does not mandate the use of absolute numerical thresholds to measure the significance of [GHG] emissions." (*Center for Biological Diversity*, *supra*, 62 Cal.4th at pp. 221, 230.) Rather, the guideline grants lead agencies " 'discretion to determine, in the context of a particular project, whether to: [¶] (1) Use a model or methodology to *quantify* greenhouse gas emissions resulting from a project, and which model . . . to use . . . and/or [¶] (2) Rely on a *qualitative analysis* or

15

performance based standards.' (CEQA Guidelines, § 15064.4, subd. (a).) Utilizing the second method, an agency may adopt an area wide plan to reduce greenhouse gas emissions and determine that a project's incremental contribution to climate change is not significant if the project complies with the requirements of the previously adopted plan. (CEQA Guidelines,§ 15183.5, subd. (b).) . . . ." (*Mission Bay Alliance v. Office of Community Investment & Infrastructure* (2016) 6 Cal.App.5th 160, 199 (*Mission Bay*).) Compliance with an area-wide regulatory program to reduce GHG emissions "may, standing alone, provide sufficient evidence that the project will have no significant adverse effect on the environment." (*Id*. at p. 202.)

"The lead agency has substantial discretion in determining the appropriate threshold of significance to evaluate the severity of a particular [environmental] impact." (*Mission Bay, supra,* 6 Cal.App.5th at p. 192; *Jensen*, *supra*, 23 Cal.App.5th at p. 885.) "A threshold is an 'identifiable quantitative, qualitative or performance level of a particular environmental effect, non-compliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant.' [(CEQA Guidelines, § 15064.7, subd (a).)] Thresholds of significance are not used to determine automatically whether a given effect will or will not be significant. Instead, thresholds of significance are indicative only that an environmental effect that crosses the threshold ' "will *normally* be determined to be significant," ' while effects not crossing the threshold ' "*normally* will be determined to be less than significant" ' by the agency.

16

[Citation]; see CEQA Guidelines, § 15064.7, subd. (a).)" (*Jensen*, *supra*, 23 Cal.App.5th at p. 885.

B. *Substantial Evidence Supports the City's Use and Application of the 3,000 Threshold for Assessing the Significance of the Project's GHG Emissions*

    1. <u>Additional Background</u>

The original GHG analysis in the draft MND estimated that the "existing emissions" (baseline GHG emissions) on the project site, from the rock and gravel crushing operation, were 899 MTCO2 e/yr., and that the project would generate 6,121 MTCO2 e/yr., for a net increase of 5,222 MTCO2 e/yr., below the 10,000 threshold. The draft MND concluded that the project would not have a cumulative impact on GHG emissions, both because the project's total emissions of 6,121 MTCO2 e/yr. would not exceed the 10,000 threshold, and because the project was consist with the UCAP. Thus, the draft MND did not recommend measures to mitigate the project's GHG emissions.

During the public review and comment period on the draft MND, UCF members and other members of the public argued that the 10,000 threshold was inappropriate and too high for the project, and urged the City to use the 3,000 threshold. In a January 17, 2020 letter to the City, Dr. Brinda Sarathy, a City resident and Professor of Environmental Analysis at Pitzer College, argued the draft MND provided "no substantive justification" for the 10,000 threshold, which applied to large-scale industrial projects with GHG emissions generated primarily from stationary sources, such as power plants and factories. Dr. Sarathy argued the project was not a "heavy industrial stationary facility such as a power plant or factory"; it was a "mixed use/commercial" project, and

17

its GHG emissions would be generated primarily from mobile source (cars, vans, trucks), not stationary sources.

Dr. Sarathy pointed out that, according to the minutes of a September 28, 2010 meeting of the "GHG CEQA Significance Threshold Stakeholder Working Group # 15," the SCAQMD) " 'presented two options that lead agencies could choose' " in selecting a significance threshold for "commercial and mixed-use projects." One option was to "use a single numerical" 3,000 MTCO2 e/yr. threshold for all "nonindustrial projects." The second option was to use a 3,000 MTCO2 e/yr. threshold for commercial and mixed use projects and 3,500 MTCO2 e/yr. threshold for residential projects. Thus, the SCAQMD proposed that lead agencies use a 3,000 MTCO2 e/yr. threshold for "all land use types," including "mixed-use" commercial and industrial projects. Dr. Sarathy also claimed that the County of San Bernardino had "adopted" the 3,000 threshold in 2010 and had used it in a draft EIR for a warehouse project similar in size and operation to the project.

As indicated, Bridge revised the project by adding sustainability features to reduce its GHG emissions below the 3,000 threshold. The sustainability features include roof-top solar panels to allow the building to operate at "net-zero" electricity consumption, EV-chargers for 30 parking spaces, "EV-ready infrastructure for all trucks, all vans, and 50% of car parking spaces," 1,000 trees, and 11 acres of landscaping. The project is also required to use electric-powered forklifts and electric landscaping equipment.

In connection with these project revisions, the City prepared the supplemental GHG analysis, which shows the project's GHG emissions, with the added sustainability features, would be 2,904 MTCO2 e/yr., slightly less than the 3,000 threshold. The

Supplemental GHG analysis states that it made several "updates" to the original GHG analysis, specifically, updates "to the existing emissions inventory;" "[a] more accurate utility emission factor;" and "[i]ncorporation of the GHG reduction" from electric vehicle chargers and solar panels.

The supplemental GHG analysis estimates that the revised project would generate 5,340 MTCO2 e/yr., 781 MTCO2 e/yr. fewer than the 6,121 MTCO2 e/yr. estimated in the original GHG analysis. Based on its revisions to the "existing emissions inventory," the supplemental GHG analysis increased the estimated baseline or "existing emissions" from the rock and gravel operation to 2,437 MTCO2 e/yr., from 899 MTCO2 e/yr., an increase of 1,538 MTCO2 e/yr. Thus, the supplemental GHG analysis estimated the project would add 2,904 MTCO2 e/yr. over the existing baseline of 2,437 MTCO2 e/yr., for a total of 5,340 MTCO2 e/yr. (rounded).

In granting UCF's petition, the superior court concluded that insufficient evidence supported the City's use of the 10,000 threshold for determining the significance of the project's impacts on GHG emissions. The court also concluded that insufficient evidence supported the City's use of the 3,000 threshold, "especially because" the 3,000 threshold had, "not been adopted by the SCAQMD and no scientific or factual basis is provided for its use."

The court pointed out that Dr. Sarathy, in advocating that the 3,000 threshold should apply to "mixed use" projects and to this project in particular, did not define mixed use. Further, the record did not include the minutes for the SCACMD's September 28, 2010 "GHG CEQA Significance Threshold Stakeholder Working Group

19

Meeting # 15"; and neither the adduced power point slides from the meeting nor anything else in the record showed why the 3,000 threshold should apply to *this* project. The court reasoned there was "no scientific or factual analysis" explaining why the 3,000 threshold should apply to "this project under the circumstances." (See CEQA Guidelines, § 15064, subd. (b).)

Further, UCF argued and the court agreed that the Supplemental GHG analysis was "without support" because, even if the 3,000 threshold applied, there was "no explanation why a different baseline for existing GHG emissions was used." Using the original baseline of 899 metric tons of $CO_2e$ per year, the court pointed out that the project's GHG emissions would be 4,441 metric tons of $CO_2e$ per year, above the 3,000 threshold. Thus, the court concluded "substantial evidence does not support a conclusion" that the project would produce GHG emissions below the 3,000 threshold "even if" the 3,000 threshold were appropriate for the project.

The court also questioned whether the City "relied on" the 3,000 threshold, given that the supplemental GHG analysis stated that it was prepared "for informational purposes only" and the City "continued to assert" that the 10,000 threshold "was the threshold that applied." In sum, the court concluded the City prejudicially abused its discretion in failing "to provide substantial evidence to justify the quantitative method used as the GHG threshold." The court also ruled an EIR was not necessarily required; the City could still "establish an appropriate threshold of significance" for GHG emissions and conclude an MND was appropriate.

2. <u>Analysis</u>

(a) *The City's Discretion to Choose A Significance Threshold*

As noted, a lead agency "has substantial discretion in determining the appropriate threshold of significance to evaluate the severity of a particular impact," and the agency's choice of threshold will be upheld if it is "founded on substantial evidence." (*Mission Bay*, *supra*, 6 Cal.App.5th at pp. 192, 206; *Jensen*, *supra*, 23 Cal.ap.5th at p. 885; *East Sacramento Partnerships For A Livable City v. City of Sacramento* (2016) 5 Cal.App.5th 281, 300; *Save Cuyama Valley v. County of Santa Barbara* (2013) 213 Cal.App.4th 1059, 1068; *Citizens for Responsible Equitable Development v. City of Chula Vista* (2011) 197 Cal.App.4th 327, 333 (*CREED*).) In reviewing an administrative record for substantial evidence to support a lead agency's adoption or use of a significance threshold, we must remember that " ' [t]he agency is the finder of fact and we must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision.' " (*Santa Clarita Organization For Planning the Environment v. City of Santa Clarita* (2011) 197 Cal.App.4th 1042, 1050.) "Although our review is de novo and nondeferential, we must give the lead agency the benefit of the doubt on any legitimate, disputed issues of credibility." (*CREED*, at p. 331.)

The CEQA Guidelines state that, "[t]he determination of whether a project may have a significant effect on the environment calls for a careful judgment on the part of the public agency involved, based to the extent possible on scientific and factual data." (CEQA Guidelines, § 15064, subd. (b).) "When adopting or using thresholds of

21

significance, a lead agency may consider thresholds of significance *previously adopted or recommended by other public agencies or recommended by experts, provided the decision of the lead agency to adopt such thresholds is supported by substantial evidence.*"  (CEQA Guidelines, § 15064.7, subd. (c), italics added.)

(b) *Substantial Evidence Supports the City's Use of the 3,000 Threshold*

We disagree with the trial court's conclusion that insufficient evidence supports the City's use of the 3,000 threshold for measuring the significance of the project's GHG emissions.  Substantial evidence shows that the 3,000 threshold is an appropriate numerical threshold for measuring the significance of the project's GHG emissions.  This evidence includes Dr. Sarathy's comments and letter to the City, explaining why the 10,000 threshold was inappropriate for the project and urging the City to use the "more stringent" 3,000 threshold.  Dr. Sarathy's comments and letter, and the record as a whole, show there is indeed a "scientific and factual" basis for using the 3,000 threshold for the project.  (CEQA Guidelines, § 15064, subd. (b).)

Dr. Sarathy noted that, according to the minutes of the "GHG CEQA Significance Group Stakeholder Meeting # 15" on September 28, 2010, the SCAQMD "presented lead agencies with the option" of using the 3,000 threshold for "all [nonindustrial] land use types," including "mixed-use" *commercial and residential* projects in particular. Although these minutes are not in the administrative record (as the court pointed out), the record includes the minutes of an earlier working group meeting, the January 28, 2009 "GHG CEQA Significance Threshold Stakeholder Working Group Meeting #8."  These minutes show the 3,000 threshold is based on data collected by the Governor's Office of

Planning and Research (OPR), the agency responsible for drafting the CEQA Guidelines. (See *Tsakopoulos Investments, LLC v. County of Sacramento* (2023) 95 Cal.App.5th 280, 288, fn. 4.)

The OPR data measured GHG emissions from 711 residential, commercial, and "mixed use" residential and commercial projects for which the OPR received an EIR or MND. According to the OPR data, 90 percent of all "residential/commercial projects" in the 711 projects surveyed (the 90 percent "capture rate") had GHG emissions ranging from 2,983 to 3,143 MTCO2 e/yr.  The 90 percent capture rate for "residential/mixed use residential projects" ranged from 3,310 to 3,596 MTCO2 e/yr., while the 90 percent capture rate for "commercial/mixed use commercial projects" ranged from 1,390 to 1,481 MTCO2e /yr. Dr. Sarathy's January 17, 2020 letter, and a slide from the September 28, 2010 SCAQMD working group meeting, indicate that the SCAQMD proposed a 3,000 threshold or "screening value" for all nonindustrial land use types, "based on review of the OPR database (711 CEQA projects) using the 90% capture rate approach."  Thus, the 3,000 threshold, as applied to all nonindustrial projects, will include or "capture" the GHG emissions levels of approximately 90 percent of all nonindustrial projects.[3]

---

[3]  In response to public comments on the draft MND, the City defended its use of the 10,000 threshold, and acknowledged that the 3,000 and 10,000 thresholds were both based on the "90% capture rate approach."  The City advised: "The SCAQMD has not adopted a GHG significance threshold that applies to most land use development projects.  The 10,000 . . . threshold was adopted to capture 90 percent of total emissions from all new or modified industrial (stationary source) projects. . . .  A 3,000 [threshold] was proposed as a screening threshold for land use development projects but was never adopted in any form by SCAQMD.  In the absence of an adopted threshold, the lead agency has discretion to select a significance threshold."

Substantial evidence shows that screening nonindustrial projects for whether their GHG emissions fall above or below the 3,000 threshold is a reasonable way to screen such projects for cumulatively considerably GHG emissions.  That is, it reasonable to consider nonindustrial projects exceeding 3,000 threshold (ten percent of all nonindustrial projects) to be *cumulatively considerable* contributors to GHG emissions *in comparison* to nonindustrial projects with GHG emissions below the 3,000 threshold.  As noted, "[t]he challenge for CEQA purposes is to determine whether the impact of the project's emissions of greenhouse gases is *cumulatively* considerable, in the sense that 'the incremental effects of [the] individual project are considerable when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects." (*Center for Biological Diversity, supra,* 62 Cal.4th 219.)  Using a 90 percent capture rate to screen nonindustrial, mixed use residential and commercial projects for cumulatively considerable (significant) GHG emissions is a reasonable way to meet this challenge.

Substantial evidence also supports the City's use of the 3,000 threshhold in evaluating the significance of *this project's* GHG emissions, after the project was revised during the public comment period to add the sustainability features.  The slides from the SCAQMD meetings, Dr. Sarathy's comments, and other comments in the record show the 3,000 threshold is appropriate for mixed use commercial and residential projects.  Thus, the use of the 3,000 threshhold use for this project was conservative, in that it tended to underestimate a reasonable level of GHG emissions for this project, which a mixed use commercial and industrial project.  The record indicates that industrial

projects, and mixed use commercial and industrial projects, like this project, tend to have higher GHG emissions than mixed use commercial and residential projects, commercial projects, and residential projects. But this project, despite its industrial component, is projected to have GHG emissions below the 3,000 threshold, the significance threshold for a typically lower emission, mixed use commercial and residential project.

Thus, the City did not abuse its discretion in concluding the project's GHG emissions would not be cumulatively considerable because they will be below the 3,000 threshold. Substantial evidence supports the City's determination, in its resolution adopting the MND, that the project, with the added sustainability features and related GHG-related mitigation measures, will not have significant, cumulatively considerable impacts on GHG emissions.

(c) *The Increase in Baseline "Existing Emissions"*

UCF argues, and the trial court agreed, that insufficient evidence supports the City's finding that the project would not have significant impacts on GHG emissions, based on the 3,000 threshold, because the supplemental GHG analysis did not explain why "existing baseline emissions increased" from 899 MTCO2 e/yr. to 2,437 MTCO2 e/yr., an increase of around 1,537 MTCO2 e/yr. Indeed, the supplemental GHG analysis did not explain the reason for the 1,537 MTCO2 e/yr. increase in baseline or existing emissions. But circumstantial evidence in the record plainly indicates that the 1,537 MTCO2 e/yr. increase is attributable to the 78 trucks being used in the existing operations on the project site.

25

The supplemental GHG analysis states that its 2,437 MTCO2 e/yr. in existing baseline GHG emissions is based on "updates to the existing emissions inventory" which were not included in the original GHG analysis in the draft MND.  Although the supplemental GHG analysis does not  identify the sources of these "updates," (the 1,537 MTCO2 e/yr. increase in existing GHG emissions), a comparison of the original and supplemental GHG analyses indicates that the 1,537 MTCO2 e/yr. increase is attributable to the 78 trucks used in the existing rock and gravel processing operation.

The draft MND explained that the existing rock and gravel operation used "eight pieces off-road heavy-duty diesel equipment, such as rubber-tire loaders, stackers, static and mobile screens, cone and crushers, and water trucks.  Additionally, the existing sand and gravel processing operations include approximately 78 trucks per day to off-haul materials processed on -site. . . .  [The ]traffic study conservatively does not take credit for the existing trucks."  These statements in the draft MND, together with the 1,537 MTCO2 e/yr. increase in the existing GHG emissions inventory in the supplemental GHG analysis, indicate that, just as the traffic study in the draft MND did not "take credit" for the daily trips generated by the 78 trucks, the original GHG analyses in the draft MND likewise did not include GHG emissions from the 78 trucks.

Moreover, a comparison of the "data sheets" in the original and supplemental GHG analyses indicates that the GHG emissions from the 78 trucks were omitted from the original GHG analysis, but were included in the "updated" emissions inventory in the supplemental GHG analysis of the 3,000 threshold.  In the original GHG analysis, the data sheets show that existing GHG emissions for unmitigated "off-site construction," in

26

the "hauling" category, were 34 MTCO2 e/yr. In the supplemental GHG analysis, the data sheets show that the same GHG emissions were 1,572 MTCO2 e/yr.—an increase of 1,537 MTCO2 e/yr.

The substantial size of the increase in baseline GHG emissions, together with the statements in the draft MND, indicates that the increase is attributable to the 78 trucks used to "off haul" materials from the project stie. As Bridge points out, the 34 MTCO2 e/yr. in the original GHG analysis "*accounted for only minimal travel of construction equipment to and from the site*." (Added italics.) But the corrected, 1,572 MTCO2 e/yr. in exiting GHG emissions (an increase of 1,537) credibly reflects the use of the 78 trucks in the rock and gravel processing operations. For these reasons, it is reasonable to infer that the original GHG analysis did not account for the existing GHG emissions from the 78 trucks used "per day to off-haul materials processed" in the rock and gravel processing operation, and that the supplemental GHG analysis corrected for and did include the GHG emissions from the 78 trucks in its analysis of the 3.000 threshold.

Thus, we disagree with the trial court's conclusion that insufficient evidence supports the City's use of the 3,000 threshold because the City failed to explain the basis of the 1,537 MTCO2 e/yr. increase in the "existing emissions" inventory (from 899 MTCO2 e/yr. to 2,437.) The record sufficiently supports the City's computation of the updated 2,437 MTCO2 e/yr. baseline.

Moreover, Bridge argues and we agree that UCF failed to exhaust administrative remedies concerning the composition of the 2,437 MTCO2 e/yr. "existing emissions" baseline. "To satisfy the exhaustion doctrine, an issue must be 'fairly presented' to the

agency. [Citation.] Evidence must be presented in a manner that gives the agency the opportunity to respond with countervailing evidence." (*Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2011) 196 Cal.App.4th 515, 528.) The petitioner " 'has the burden of proof to show exhaustion occurred.' " (*Stop Syar Expansion v. County of Napa* (2021) 63 Cal.App.5th 444, 459.)

UCF has not met this burden. Throughout the administrative proceedings, no one asked the City to explain the sources of either the updated 2,437 MTCO2 e/yr. baseline or the original 899 MTCO2 e/yr. baseline. Thus, the City was never asked to explain the or sources of the 1,538 MTCO2 e/yr. increase in the baseline. In addition, UCF forfeited the claim by failing to raise it in the trial court until its reply brief. (*Golden Door Properties*, *LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 518.)

(d) *The City's CEQA Findings Are Properly Based on the 3,000 Threshold*

UCF argues that, by the City's "own admission," the City's use of the 3,000 threshold in the supplemental GHG analysis does not support the City's GHG-generation findings because "the GHG-generation findings in the MND *relied solely* on the City's determination that the 10,000 threshold applied and that the Project's net GHG generation would be less than the 10,000 threshold." This argument conflates the City's finding, in its resolution adopting the MND, that the project, with the added sustainability features and related mitigated measures, would not significantly impact GHG emissions, with the City's finding, in *the superseded*, *draft MND*, that the project would not significantly impact GHG emissions because its GHG emissions would not exceed the 10,000 threshold. As explained, the City's resolution adopting the final MND is

28

supported by substantial evidence, including the supplemental GHG analysis, which concluded that the project's GHG impacts would not be cumulatively considerable because they would not exceed the 3,000 threshold.

UCF suggests the supplemental GHG analysis does not constitute sufficient evidence to support the City's resolution adopting the MND, because the supplemental GHG analysis states that it was prepared "for informational purposes only." As Bridge points out, however, UCF cites no authority that "discounts" the supplemental GHG analysis "as substantial evidence." In sum, the City's resolution adopting the final MND is supported by the supplemental GHG analysis and the record as a whole, which show that the project's net GHG emissions will not be cumulatively considerable as they will not exceed the 3,000 threshold.

C. *No Substantial Evidence Supports a Fair Argument That the Project's GHG Emissions May Be Cumulatively Considerable*

Having concluded that substantial evidence supports the City's use of the 3,000 threshold for assessing the significance of the project's GHG emissions, we recognize that a significance threshold "is not conclusive . . . and does not relieve a public agency of the duty to consider the evidence under the fair argument standard. [Citations.] A public agency cannot apply a threshold of significance or regulatory standard 'in a way that forecloses the consideration of any other substantial evidence showing there may be a significant effect.' " (*Mejia v. City of Los Angeles* (2005) 130 Cal.App.4th 322, 342.)

UCF claims it presented a fair argument that the project's GHG emissions may be cumulatively considerable due to "the marked increase in mobile source emissions

caused by the project" over the baseline, existing GHG emissions from the existing rock and gravel crushing operation. Specifically, UCF argues it showed the project may have cumulative considerable GHG emissions (1) due to "increased emissions from the influx of delivery cars and vans—that is, because the project will have higher GHG emissions than the rock and gravel crushing operation, and (2) because "the traffic counts for the project were artificially low." As we explain below in our discussion of UCF's appeal, UCF has not shown there is a fair argument that the project may have cumulatively considerable impacts on GHG emissions.

D. *Bridge Has Forfeited the UCAP Consistency Argument*

In their joint opposition brief to UCF's petition, Bridge and the City defended UCF's claim that insufficient evidence supported the City's determination that the project would not significantly impact GHG emissions—solely by arguing that substantial evidence supported the City's finding that the project's GHG emissions would not exceed the 10,000 and 3000 MTCO2 e/yr. thresholds. But Bridge and the City did not claim that the project's GHG emissions would be insignificant because the project is consistent with the UCAP. (See *McCann v. City of San Diego* (2021) 70 Cal.App.5th 51, 92 [Climate action plans " 'may, if sufficiently detailed and adequately supported, be used in later project-specific CEQA documents to simplify the evaluation of the project's cumulative contribution to the effects of greenhouse gas emissions.' "].) Counsel for Bridge mentioned the UCAP consistency argument for the first time at the hearing on UCF's petition in the superior court, but the court appropriately did not rule on the unbriefed issue.

In failing to raise the UCAP consistency argument as a defense to UCF's claim that insufficient evidence supported the City's determination that the project's net GHG emissions would not be cumulatively considerable, Bridge failed to preserve the claim for appeal. That is, Bridge forfeited the argument it now raises in this appeal that the City's less-than-significance finding for the project's net GHG emissions is sufficiently supported by the City's UCAP consistency finding, independent of the City's findings that the project's net GHG emissions would be below the 10,000 and 3,000 thresholds. (See *In re T.F.* (2017) 16 Cal.App.5th 202, 213.) We decline to exercise our discretion to consider the UCAP consistency issue. (*Id*. at pp. 213-214.)

## V. ANALYSIS/ UCF'S APPEAL

In its appeal, UCF claims its petition should have been granted on an additional ground, namely, (1) the City performed a legally inadequate analysis of the project's traffic impacts; thus, (2) the City's analyses of the project's impacts on air quality and GHG emissions are also inadequate because they relied in part on the City's deficient traffic analysis. We find no merit to this claim; thus, we reject UCF's appeal.

A. *No Substantial Evidence Supports a Fair Argument That the MND Undercounted the "Passenger Car Equivalent"(PCE) Trips the Project Was Expected to Generate*

UCF claims "there is a fair argument that the project will have significant transportation impacts" because the MND "severely understates" the number of vehicles and vehicle trips the project would generate. As we explain, no substantial evidence shows that the MND underestimated the number of vehicles or vehicle trips the project would generate.

31

1. Background/ the Traffic Impact Analysis (TIA)

The MND includes a "traffic impact analysis" (the TIA), prepared in November 2019, which analyzed the project's impacts on traffic levels of service (LOS). The MND explained: "Level of service (LOS) is a measure of the quality of operational conditions within a traffic stream and is generally expressed in terms of such measures as speed and travel time, freedom to maneuver, traffic interruptions, and comfort and convenience. Levels range from A to F, with LOS A representing excellent (free-flow) conditions and LOS F representing extreme congestion."

The TIA states that its purpose and objective was twofold: (1) to disclose "potential impacts and mitigation measures per" CEQA, and (2) to "satisfy the requirements for a TIA established by the San Bernardino County Congestion Management Plan," adopted in 1993, and last revised in 2016 (the CMP). The CMP, administered by the San Bernardino County Transportation Authority (SBCTA), required "an analysis of off-site intersections . . . at which the project is forecast to add 50 or more peak hour trips." The TIA "evaluated 17 intersections and project driveways" and proposed "circulation improvements" at intersections that were forecast to operate at unsatisfactory LOS. Based on the TIA, the MND concluded the project would have less than significant impacts on LOS.

For its LOS analysis, because the project was to be operated as a "parcel delivery" warehouse, the TIA used "trip generation rates" for the land use classification, " 'High-Cube Parcel Hub Warehouse' " from the "Institute of Transportation Engineers' (ITE) Trip Generation [manual] (10th Edition) [ITE Code 156]." The MND explained why the

32

TIA selected the parcel hub warehouse classification to calculate the project's trip generation rates: "[T]he operations of the proposed Project would be similar to high-cube parcel hub warehouse facilities, but with some differences . . . . Warehouse/parcel delivery uses typically entail one merchant/vendor, while parcel hub warehouses such as Fed Ex and UPS typically work with multiple merchants and vendors. Another difference is that parcel hub facilities have high truck traffic throughout the day, while the proposed warehouse/parcel delivery use would have a majority of truck trips occurring during the off-peak hours. . . . The rates included in the ITE Trip Generation for Parcel Hub Warehouses are net rates inclusive of passenger car, delivery vans, and truck traffic. However, to present a conservative analysis, the trip generation rates from the Trip Generation [manual] has been assumed to be passenger cars and vans, and truck traffic has been added to the trip generation estimates."

Based on the parcel hub warehouse classification (ITE Code 156), the TIA estimated the project would generate a total of 2,583 daily "passenger car equivalent" (PCE) trips. Based on this estimate, the TIA concluded the project would not significantly impact LOS or "directly degrade traffic operations below those acceptable in the City's general plan." The TIA noted it "likely overstat[ed] project impacts" on LOS because the 2,583 daily PCE trip estimate was based on a larger, 276,835-square-foot warehouse building, when the proposed project, a 201,096-square-foot warehouse building, would have 75,729 fewer square feet.

Regarding "truck trips" associated with the project, the MND explained: "[A] total of 25 trucks will arrive to the facility daily [(for a total of 50 truck trips)], of which

33

2% would occur during each of the a.m. and p.m. peak hours [(between 7:00 a.m. and 9:00 a.m. and between 4:00 p.m. and 6:00 p.m.)]. "No more than five trucks would travel to the site during daytime hours. The peak hour truck trips were converted to passenger car equivalent (PCEs) using [a multiplier of] 3.0 for 4-axle trucks." MND also explained: "Table 24, Project Trip Generation, summarizes the project trip generation. As shown in Table 24, the project is forecast to generate 202 PCE trips in the a.m. peak hour, 202 PCE trips in the p.m. peak hour, and 2,583 daily PCE trips. The traffic study conservatively does not take credit for the existing truck trips."

2. Analysis/Alternative Trip Generation Rates

UCF first argues that the TIA underestimated the project's daily PCE trips by using the wrong "trip generation rate" classification, namely, ITE Code 156, rather than ITE Code 155, to calculate the project's daily PCE trips. The record shows, however, that the City calculated the project's daily PCE trips using *both* ITE Code classifications, and found no significant LOS impacts under either.

In January 2020, during the public comment period on the draft MND, the City of Claremont wrote a letter to the City, claiming the TIA was underestimating the project's traffic impacts by failing to use the trip generation rate for the ITE "fulfillment center" classification or type of high cube warehouse (ITE Code 155), rather than the ITE "parcel hub" classification (ITE Code 156). The letter included a memorandum prepared by an engineering firm, showing that two studies, one by the ITE and another by the Western Riverside Council of Governments (WRCOG), distinguished between five types of high

34

cube warehouses for purposes of calculating daily PCE trips: transload, short-term storage, cold storage, fulfillment center, and parcel hub.

The ITE study defined a "fulfillment center" as a warehouse with the following characteristics: "storage and direct distribution of e-commerce product to end users; smaller packages and quantities than for other types of [high-cube warehouses]; often mezzanine levels for product storage and Pick-and-pack area comprises majority of space, larger parking supply ratio than for all other [high-cube warehouse] types." In contrast, the ITE study defined a "parcel hub" warehouse as "transload function for a parcel delivery company" with the following characteristics: "a regional and local freight-forwarder facility for time sensitive shipments via air freight and ground (e.g., UPS, FedEx, USPS); site often includes truck maintenance, wash, or fueling facilities, limited or no breakbulk, repack or assembly activities, larger employee parking ratios; truck drivers often based at facility (i.e., parking may be for both site employees and drivers, typically in close proximity to airport, often stand-alone[)]."

Based on these operational distinctions between parcel hub and fulfillment center warehouses, the City of Claremont argued in its letter that the TIA should have used the fulfillment center classification (ITE Code 155) to estimate the project's daily PCE trips. The City of Claremont asserted that the fulfillment center classification would result in "lower AM peak hour trips *but higher PM peak and Daily Vehicle trips for the project*." (Italics added.) In response, the City "ran the analysis using the trip generation rate for fulfillment centers" (ITE Code 155) for a 201,906-square-foot warehouse. This analysis showed that a 201,096-square-foot warehouse would generate slightly higher PCE trips

during the p.m. peak hour (276), but would generate total daily PCE trips of 1,953—630 fewer than the 2,583 total daily PCE trips the TIA estimated the project would generate using the parcel hub classification (ITE Code 156) and assuming a larger, 276,825-square-foot warehouse.

UCF ignores the City's supplemental analysis using ITE Code 155. UCF argues, "the record lacks substantial evidence to prove that the right classifications were used . . . ." UAOB 58} Again, however, the City calculated the project's daily PCE trips using trip generation rates using *both* the parcel hub (ITE Code 156) *and* fulfillment center (ITE Code 155) warehouse classifications, and found no significant impacts on LOS under either classification. Thus, there is no merit to UCF's claim that the TIA underestimated the project's daily PCE trips by using the wrong ITE Code or warehouse classification.

3. Analysis/Delivery Vans, Trucks, and Truck Trips

Next, UCF argues that the TIA and the MND did not explain how PCE trips from delivery vans and trucks associated with the project "factored in" to the TIA's 2,583 daily PCE trip estimate. We disagree. First, in response to comments on the MND and TIA, the City explained how trips from delivery vans "factored in" to the TIA's 2,583 daily PCE trip estimate. The City stated: "Van parking spaces are not an indicator of actual trip generation. Rather, the trip generation rate is appropriately based on building square footage because building square footage represents the total amount of goods/delivery capacity of a building."

Second, the MND and the TIA showed how the 50 daily truck trips that the project was expected to generate "factored in" to the 2,583 daily PCE trip estimate. The MND and TIA explained that "the rates included" in ITE Code 156 for parcel hub warehouses "are net rates inclusive of passenger car, delivery vans, and truck traffic. However, to present a conservative analysis, the trip generation rates" using ITE Code 156 were "assumed to be passenger cars and vans, and truck traffic *has been added to the trip generation estimate*." (Italics added.)

The TIA (Table 24) showed the warehouse portion of the project was expected to generate 2,068 daily PCE trips, and that the retail/office portion of the project would generate an additional 365 daily PCE trips, for a total of 2,433 daily PCE trips (2,068 plus 350 equals 2,433). And, in order to "conservatively" account for the project's expected 50 daily trips from 4.0 axle trucks, the TIA multiplied the 50 daily truck trips by a factor of 3.0, and estimated the project would generate an *additional* 150 daily PCE trips based on the 50 truck trips. The TIA then *added* this 150 daily PCE trip estimate to the PCE trip estimate of 2,433 that was based on the size of the building (ITE Code 156), to arrive at the 2,583 daily PCE trip estimate for the project (2,433 plus 150 equals 2,583).

UCF notes the ITE Manual is not included in the record and argues this means "there is nothing in the record to explain or substantiate how or why "25 daily trucks translated into 2,583 daily PCE trips." There is no merit to this claim. Bridge points out that the ITE Manuel "is a highly technical document with thousands of pages of tables and charts," and argues "the traffic engineer's expert statement providing the ITE trip

rates are in the TIA, which is itself record evidence of the data in the ITE manual."  We agree with the Bridge on this point.

As discussed, the MND and TIA explained why the TIA used the trip generation rates for "parcel hub" warehouses (ITE Code 156) to calculate the project's daily PCE trips.  As Bridge points out, "there is no disagreement as to what the ITE rates are, nor any evidence to dispute the rates provided in the MND for ITE code 156."  In addition, the public had access to the ITE Manuel through the City, which constructively possessed it through the traffic engineering firm that prepared the TIA.  (See *Consolidated Irritation Dist. v. Superior Court* (2012) 205 Cal.App.4th 697, 710-711 ["[A]n agency has constructive possession of records if it has the right to control the records, either directly or through another person."].)  Thus, there was no need for the City to include a copy of the voluminous ITE Manual in the administrative record.

UCF argues the record does not support the City's methodology for converting trucks to passenger car equivalents.  That is, UCF argues "nothing in the record explains why the TIA multiplied the project's anticipated 50 daily truck trips by a factor of 3.0, to convert those 50 daily truck trips to 150 daily PCE trips.  UCF argues "the MND mentions an 'axel' conversion, but again nothing substantiates how or why a 4-axle truck translates into 3.0 passenger cars for purposes of evaluating transportation impacts."  This argument, too, disregards the record.

As Bridge points out, the 3.0 PCE conversion ratio for 4.0 axle trucks is the ratio that the cities San Bernardino County were required to use, in analyzing LOS impacts, under the CMP, as updated in 2016.  The CMP required cities to use the following PCE

38

rates in analyzing impacts on LOS: "For light duty trucks (such as service vehicles, buses, RV's and dual rear wheels) use a PCE of 1.5. For medium duty trucks with 3 axles, use a PCE of 2.0. *For heavy duty trucks with 4 axles, use a PCE of 3.0.*" Thus, the record fully substantiates the TIA's use of the 3.0 PCE conversion ratio for 4.0 axle trucks.

4. Analysis/the "Retail Use" Comparison

In a "retail analysis memorandum," the TIA analyzed the project's impacts on LOS based on the number of daily PCE trips the project would have generated if it were a 276,825-square-foot building developed for retail uses. This analysis used the ITE trip generation rate for "Shopping Center" (Land Use 820), and showed that a retail use for the building would generate substantially more daily PCE trips than the project would generate as a parcel hub warehouse.

The draft MND summarized the findings of the retail analysis memorandum: "[A] retail use for the same size building would generate 62 trips more than the proposed warehouse Project in the a.m. peak hour, 498 trips more than the Project in the p.m. peak hour, and 5,459 more daily trips than the Project. The proposed warehouse project is anticipated to generate 50 daily truck trips. . . . [A] retail building the same size as the proposed Project is anticipated to generate approximately 310 daily truck trips. Therefore, a retail building would generate 260 more truck trips per day than the proposed Project."

UCF claims the City's comparative "retail analysis" of the daily PCE trips that would be generated from a same-size building developed for retail uses "set up an

39

illusory comparison of transportation impacts that is impermissible under CEQA" We disagree. UCF relies on the settled proposition that, "[a]n approach using *hypothetical allowable conditions* as the baseline [to describe the physical environmental conditions in the vicinity of the project as they exist at the time environmental analysis is commenced (CEQA Guidelines, § 15125, subd. (a))] results in 'illusory' comparisons that 'can only mislead the public as to the reality of the impacts and subvert full consideration of the actual environmental impacts,' a result at direct odds with CEQA's intent." (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 322, italics added.) But the City *did not* use the hypothetical retail use of the project *as a baseline* for assessing any of the project's environmental impacts. (*Id*. at pp. 320-322.) Although, as UCF argues, the retail use comparison may have "made the project's trip generation look more attractive or favorable by comparison" to a retail use, the retail analysis memorandum was not illusory or misleading "as to the reality" of the project's impacts and was, therefore, not at odds with CEQA. (*Id*. at p. 322; see CEQA Guidelines, § 15126.6 [EIR required to study reasonable range of project alternatives].)

B. *UCF's Transportation Impact Claims Are Either Moot Or Unsupported*

In the trial court, UCF argued that the City's traffic impact analysis, the TIA, was flawed because it "neglecte[d] to consider the traffic impacts implied by 1,104 van parking stalls and 337 automobile parking spaces." The trial court found this traffic impact claim was moot because it was based on LOS. (*Citizens for Positive Growth & Preservation, supra,* 43 Cal.App.5th at pp. 625-626 (*Citizens*); § 21009, subd. (b)(2).)

UCF claims its "transportation-related claims are not moot" and *Citizens* is distinguishable because UCF's traffic and transportation impact claims are based on "vehicle miles traveled" (VMT), not LOS, and the City abused its discretion in using "defunct LOS methodology to evaluate transportation impacts." We address these claims in turn.

1. UCF's Traffic Impact Claims Are Moot

Section 21099 was enacted effective January 1, 2014. (Stats. 2013, ch. 386 (S.B. 743), § 5.) It directed the OPR to develop CEQA guidelines "establishing criteria for determining the significance of transportation impacts of projects within transit priority areas." (§ 21099, subd. (b)(1).) It states: "Upon certification of the guidelines by the Secretary of the Natural Resources Agency pursuant to this section, automobile delay, as described solely by level of service or similar measures of vehicular capacity or traffic congestion, shall not be considered a significant impact on the environment . . . ." (§ 21009, subd. (b)(2).)

In 2018, the Secretary of the Natural Resources Agency certified Guidelines section 15064.3 (Determining the Significance of Transportation Impacts). (*Citizens for Positive Growth & Preservation*, *supra*, 43 Cal.App.5th at pp. 625-626; § 21009, subd. (b)(2).) Thereafter, on December 28, 2018, the Office of Administrative Law approved the guideline, and the guideline became operative. (*Citizens*, at pp. 625-626.) By its terms, the guideline is prospective only; although agencies could elect to be "immediately" governed by its provisions, the guideline did not apply "statewide" until July 1, 2020. (CEQA Guidelines, §§ 15007, 15064.3, subd. (c).)

41

Here, the City did not elect to be governed CEQA Guidelines section 15064 before the guideline went into effect statewide on July 1, 2020.  Thus, the guideline was not binding on the City until July 1, 2020. (CEQA Guidelines, § 15064.3, subd. (c).)

Guidelines section 15064.3 "describes specific considerations for evaluating a project's transportation impacts" and provides that, "[g]enerally, vehicle miles traveled [VMT] is the most appropriate measure of transportation impacts."  (CEQA Guidelines, § 15064.3, subd. (a).)  The guideline defines VMT as "the amount and distance of automobile travel attributable to a project." (*Ibid*.)  "Other relevant considerations" in determining the significance of a project's transportation impacts "may include the effects of the project on transit and non-motorized travel."  (*Ibid*.)  The guideline expressly states, however, that, except for road capacity projects, "a project's effect on automobile delay shall not constitute a significant environmental impact."  (*Ibid*.)

In *Citizens*, the petitioner challenged the validity, under CEQA, of the City of Sacramento's 2035 General Plan and EIR for the general plan, claiming, in relevant part, that the EIR did not adequately analyze and mitigate the general plan's impacts on traffic congestion.  (*Citizens*, *supra*, 43 Cal.App.5th at pp. 615, 625.)  *Citizens* held that section 21099, subdivision (b)(2), and its implementing regulation, CEQA Guidelines section 15064.3, rendered the traffic impacts argument moot.  (*Citizens,* at pp. 625-626.)

Applying the maxim that, in mandamus proceedings, " ' the law to be applied is that which is current at the time of judgment in the appellate court,' " *Citizens* reasoned that, in the words of section 21009, subdivision (b)(2), the law in effect at the time the appellate court judgment was issued in *Citizens*, " 'automobile delay, as described solely

42

by level of service or similar measures of vehicular capacity or traffic congestion' " could no longer be considered a significant environmental impact. (*Citizens*, *supra*, 43 Cal.App.5th at pp. 625-626, quoting § 21009, subd. (b)(2).) Thus, the petitioner's claim was moot because it was based on "traffic congestion" or "LOS (i.e., automobile delay)" and, under current law, section 21009, subdivision (b)(2), the 2035 General Plan's impacts on LOS could no longer be considered significant. (*Citizens*, at p. 626; accord, *Ocean Street Extension Neighborhood Assn. v. City of Santa Cruz* (2021) 73 Cal.App.5th 985, 1021 ["Because LOS-based traffic analysis is no longer a consideration to determine if a project's [transportation] impact is significant, the City would be under no obligation to conduct a LOS-based analysis on remand."].)

Similarly here, UCF's traffic/transportation impacts claim is moot because it is based on traffic congestion or LOS. In UCF's words, UCF's claim is based "*on an under-counting of vehicles and vehicle trips*." (Italics added.) This is indistinguishable from "automobile delay, as described solely by level of service traffic [LOS] or similar measures of vehicular capacity of traffic congestion"—the type of traffic impact that has not been considered significant since Guideline section 15064.3 became operative, and implemented section 21009, subdivision (b)(2), on December 28, 2018. (See *Citizens*, *supra*, 43 Cal.App.5th at pp. 625-626; *Ocean Street*, *supra*, 73 Cal.App.5th at p. 1021.)

Because LOS impacts are no longer considered significant, on remand, the City would not be required to conduct a new LOS analysis. (*Citizens*, *supra*, 43 Cal.App.5th at p. 626; *Ocean Street*, *supra*, 73 Cal.App.5th at p. 1021.) Thus, a court cannot grant UCF effective relief on its LOS-related traffic impact claims, as the claims are not viable

43

under current law. (*People v. Dunley* (2016) 247 Cal.App.4th 1438, 1445 ["A case becomes moot when a court ruling can have no practical effect or cannot provide the parties with effective relief."].)

UCF argues that its traffic impact claim—that the City "under-counted the number of vehicles and vehicle trips" the project was expected to generate—is not moot because it is not based on traffic congestion or LOS (automobile delay); rather, it is based on VMT. But as Bridge points out, UCF's argument on appeal misrepresents UCF's argument in the trial court. In its opening brief in the trial court, UCF argued "the traffic study [the TIA] inadequately captures the negative impact of traffic and levels of congestion associated with the [project]," and that, "residents' first-person observations of the congested traffic situation around the project site" required the City to prepare an EIR. Again, UCF's traffic impact claims are moot because they assert that the City inadequately assessed the project's impacts on LOS.

UCF counters that "[t]he number of vehicles attributable to the Project has a direct correlation with VMT; the more vehicles there are, the more vehicle miles traveled there are. . . . There is not a similar correlation between number of vehicles and automobile delay . . . . *Citizens* does not apply here because automobile delay was not the impact for which substantial evidence of a fair argument was presented." Again, however, the record does not support this claim. Because UCF's traffic impacts claim in the trial court, and in this appeal, is based on LOS, the claim is moot by operation of law. (*Citizens*, *supra*, 43 Cal.App.5th at pp. 625-626.)

## 2. The City Conducted a VMT Analysis, and It Was Not Challenged

UCF claims the City abused its discretion in performing a "defunct LOS analysis" of the project's traffic and transportation impacts, and the City should have instead performed a VMT analysis of the project's transportation impacts. This claim fails for several reasons. First, during the public review period, *the City did*, *in fact*, *perform a VMT analysis* "for information purposes," which found the project would have less than significant transportation impacts "were VMT to be adopted as a threshold."

The VMT analysis concluded that the "per capita VMT" for the project was "anticipated to be 6.5% less than the per capita VMT for employees in Upland, and 12.32% lower than [the per capita VMT for] the County of San Bernardino." Using a VMT significance threshold of " 'no more than existing' "—"similar to what several cities in Riverside County" had adopted "following WRCOG guidance"—the VMT analysis concluded the project "would have a less than significant impact" on transportation.

The VMT analysis states that it was prepared "consistent with CEQA Guidelines section 15064.3 and the Technical Advisory published by OPR . . . *for informational purposes*." (Italics added.) The VMT analysis was released to the public on February 12, 2020, as part the agenda packet for a City planning commission meeting, before the City adopted the MND on April 1, 2020.

In its opening brief in this appeal, UCF ignores the VMT analysis and assumes the City did not prepare a VMT analysis. In its respondent's brief, Bridge correctly points out that UCF failed to exhaust its administrative remedies concerning the VMT analysis.

No one, including UCF, challenged the VMT analysis by commenting on it during the public comment period on the project. " 'Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action.' " (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 CalApp.4th 603, 615.) " 'The exhaustion of administrative remedies doctrine "bars the pursuit of a judicial remedy by a person to whom administrative action was available for the purpose of enforcing the right [the person] seeks to assert in court . . . ." ' " (*Clews Land & Livestock, LLC v. City of San Diego* (2017) 19 Cal.App.5th 161, 184.) Thus, as Bridge argues, UCF failed to exhaust its administrative remedies on the VMT analysis, and, as a result, UCF cannot challenge the VMT analysis in this mandamus proceeding.

As Bridge argues, UCF' s refusal to acknowledge the VMT analysis "defeats all" of UCF's arguments regarding the MND's analysis of the project's transportation impacts. Indeed, the City's preparation of the VMT analysis defeats UCF's argument that the City abused its discretion in using LOS as the means of measuring the project's impacts on traffic and transportation. As Bridge points out, the City was required to analyze the project's impacts on LOS to comply with the CMP, but the City was not required to prepare the VMT analysis in order to comply with CEQA and Guidelines section 15064.3.[4]

_____

[4] Although the City completed a VMT analysis of the project's transportation impacts in response to comments on the draft MND, the City was not required to perform a VMT analysis and would not be required to perform a new or modified VMT analysis on remand. (See *Citizens*, *supra*, 43 Cal.App.5th at p. 626.) Guidelines section 15064.3 generally requires agencies to perform VMT analyses in evaluating a project's

[footnote continued on next page]

Lastly, even if UCF's traffic impacts claim is based on VMT, rather than LOS, and is therefore not moot, the claim lacks merit because no substantial evidence supports it. For the reasons explained, UCF has not shown that the City, in the MND, the TIA, or the VMT analysis, undercounted the "vehicles and vehicle trips" daily PCE trips attributable to the project. More broadly, UCF has pointed to no substantial evidence supporting a fair argument that the project could have significant traffic or transportation impacts, based on a VMT methodology or any other analysis. Thus, there is no merit to UCF's claim that the project may have significant transportation impacts.

D. *UCF's Air Traffic and GHG Emissions Claims Also Lack Merit*

UCF's claim that the project could have significant impacts on air quality and GHG emissions is based solely on UCF's unsupported claim that the project could have significant impacts on transportation. Because there is no merit to UCF's claim that the project could have significant transportation impacts, there no merit to UCF's claim that

---

transportation impacts. (Guidelines §15064.3, subd. (a).) But because the guideline is prospective, as described in Guidelines section 15007 (*id*. at subd. (c)), the guideline does not apply to " 'steps in the CEQA process' " that were "undertaken" before the agency became governed by the guideline (*IBC Business Owners for Sensible Development v. City of Irvine* (2023) 88 Cal.App.5th 100, 122-125 (*IBC*) ["[The City did not have to comply with the VMT Guideline because the addendum process had already been 'undertaken' by the time [Guideline § 15064.3] became applicable"]; *Citizens*, at p. 626 ["[B]ecause CEQA Guidelines section 15064.3 is prospective and does not presently require the City to use the criteria set forth therein, Citizens' argument that the City failed to analyze the 2035 General Plan's traffic impacts under the [VMT] criteria in the regulation fails . . . ."].) Here, the City undertook (and completed) the process of preparing the TIA before Guidelines section 15064.3 went into effect statewide, and became binding on the City, on July 1, 2020. (Guidelines, § 15064.3, subd. (c).) Thus, the City was not required to perform a VMT analysis of the project's transportation impacts, and the City would not be required to perform a new or modified VMT analysis on remand. (*IBC*, at pp. 122-125; *Citizens*, at p. 626.)

the project could also, by extension, have significant impacts on air quality and GHG emissions.

## VI.  DISPOSITION

The judgment is reversed.  The matter is remanded to the superior court with directions to enter a new judgment denying UCF's writ petition in its entirety.

FIELDS                

J.

We concur:


MILLER            

Acting P. J.


RAPHAEL         

J.

Filed 9/13/24

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| UPLAND COMMUNITY FIRST,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY OF UPLAND,<br><br>    Defendant and Respondent;<br><br>BRIDGE DEVELOPMENT PARTNERS, LLC,<br><br>    Real Party in Interest and Appellant. | E078241<br><br>(Super.Ct.No. CIVDS2013558)<br><br>ORDER MODIFYING AND CERTIFYING OPINION FOR PUBLICATION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT

The opinion filed in this matter on August 15, 2024, is modified as follows:

On page 4, in the first full paragraph, which begins, "In its appeal, Bridge claims . . . ," insert the word "that" between the words "claims" and "any" in the sentence, which begins, "Bridge further claims . . . ."

1

On page 4, in the last paragraph, in the fourth line from the bottom, insert the words "impacts on" between the words "project's" and "GHG emissions."

On page 24, in the second line from the bottom, insert the word "is" between the words "which" and "a."

On page 24, in the last line, italicize the words "and industrial."

These modifications do not change the judgment.

The request for publication of the nonpublished opinion filed in the above matter on September 4, 2024, is GRANTED. The opinion meets the standards for publication as specified in California Rules of Court, rule 8.1105(c).

IT IS SO ORDERED that said opinion, filed August 15, 2024, be certified for publication.

CERTIFIED FOR PUBLICATION


FIELDS _____
J.

We concur:


MILLER _____
Acting P. J.


RAPHAEL _____
J.


2